Case number 22-1337 et al. International Dark-Sky Association, Inc. Appellants v. Federal Communications Commission. Mr. Mugg for the Appellant International Dark-Sky Association, Inc. Mr. Michelokoulos for the Appellant Dish Network Corporation. Mr. Carr for the FLE, Issues Raised by Dish Network. Ms. May for the FLE, Issues Raised by International Dark-Sky. Mr. Shaw for the Intervenor. Mr. Mudd, whenever you're ready. Thank you. Good morning, Your Honors. May it please the Court. My name is Charles Lee Mudd, Jr. On behalf of the Appellant International Dark-Sky Association, or Dark-Sky, and with the Not too long ago, before my father passed away, he and I spoke about how growing up in the country in Kentucky, he could walk outside when doing the chores in the morning and see the Milky Way. Lost now, even in the Kentucky country, you're not really able to see the Milky Way. And that kind of reminds me similarly to an analogous situation with young students in Chicago that have never really ventured to the suburbs or beyond. And when they do, on exploratory aspects, they're amazed at a different world that they see in the night sky with a number of stars. Now, both of those situations involve ground-based light pollution. And on that issue, the society, we happen to be in efforts to remediate. But here, too, we're focused on the effects on the ground, the Earth, here terrestrially. Yes, we're at issue with satellites. And yes, we're talking to some extent or a large extent about solar reflectivity of the satellites. But let's not forget that Earth terrestrially is central. The satellites are developed and planned here on Earth. They're manufactured here on Earth. They're launched from Earth. And for some, there's re-entry into Earth's atmosphere. They're operated from Earth. And most importantly for today, the effects that we're talking about are here on Earth terrestrially. So we're not... Mr. Mudd, maybe we could start out by talking about standing for your organization. I first have some questions on redressability. So, for instance, if the license here were to be set aside, what would be the practical consequence of that for the harms alleged here? Because satellites, the FCC here is licensing radio frequencies and transmissions. It's not regulating the actual launching of the satellites into space. I mean, that's the FAA and I assume other agencies as well. So can you speak to redressability here? Yes. And in doing so, focus on two points. First, to your latter comment, the FCC for better or for worse has really stepped in to be the sheriff and regulate outer space activities in that regard. For example, mitigating space debris and the satellites and requiring requirements on that. The FAA is the launch and re-entry. There's also NOAA for Earth observation. But in terms of the operations of the satellites during their lifespan, that is the FCC. And so this falls clearly in their purview. But to your first point, the redressability and what is the effect of reversing the license, it's compliance with the law. NEPA and the FCC's own regulations clearly state, and even if with respect to the categorical exclusion, though it's an antiquated assessment that the FCC has made of its activities, but even with that categorical exclusion, its own regulations point out that if a third party submits evidence and contends that there are significant environmental effects... That doesn't go to standing, though. That doesn't go to the question of redressability. So you're talking about our standing with respect to how... Your standing, right. Which we have to assure ourselves that you have before we reach the merits of your claim. Sure. And this court has previously addressed another case involving a SpaceX application in the FCC decision and found there that organizations did not have standing. And clearly those organizations in that case are distinctly different than the International Dark Sky. And if there is the environmental assessment required and they go through that process, the IDA benefits by having, ideally, if there are significant effects, which we contend there are, that the FCC will address those and look at those and come up with orders that balance all the interests. The failure to do that is we might end up having a diminished dark sky. 7,500, even the reduced number of satellites, doubles the amount of active satellites worldwide. And when you talk about a broader aspect of the effects on the night sky, astronomy, the cultural effects, and so forth, that's significant. And that's where our standing comes in, because we have a vested interest in making sure that the satellites that are launched and the applications for licenses are compliant with law, where there are... So is it your contention that if the FCC were to make a different decision, that these satellites would not be launched? Because I think there has to be some sort of... But it's not... I mean, there still has to be some link between the NEPA analysis and the harm that's being alleged. Right. But I would also contend that redressability does not mean that a party has to guarantee that everything will be resolved in its favor. We just want... I didn't say that. There still has to be some link, though. There has to be some causal connection. And I would argue that... Between the procedural... Between the NEPA procedure and the harms that you want redressed. Right. And I would argue that the FCC's own regulations provide that redressability and that nexus. It states, if an interested person alleges that a particular action, otherwise categorically excluded, will have a significant environmental effect, the person shall electronically submit, et cetera. And we have a vested interest... Mr. Mudd, the FCC doesn't have a standing requirement of an Article 3 court. They welcome all comers and comments. Sure. Including people who would not have standing in court. So we're still waiting for your focus on redressability for you and for your members and organizations. Well, all right. So the redressability, if there are significant effects and there were additional mitigating aspects that the FCC would have to impose on SpaceX, then we are benefiting by the continued existence of a dark sky as we know it today. Would you, with respect to the standing argument, though, distinguish standing with respect to light pollution claims versus the aluminum deposits versus the launch emissions? Because I feel like blending everything and there might be distinctions at least there. Well, with respect to the alumina, the alumina itself can diffuse the night sky and have an effect on the overall brightness or darkness of the night sky. And so I understand, and that the other parties have argued, that the atmospheric effect is something completely outside the purview of the IDA by its degree in principle. And I think that that would be a very narrow reading of the contours of what the IDA is advocating and interested in because all these issues are related. But I don't think we need to even address that because the alumina does have and can have a significant effect as it increases on diffusing the atmosphere such that the dark sky becomes lighter. So the agency relied upon a, I guess it was the European Space Agency, wasn't it, saying that there was no significant effect? The actual, with all due respect, Your Honor, I believe that the ESA reports contended that there was needing to be more studies and that there wasn't a definitive conclusion that could be made. And I would argue, too, they could not at this time or when they did the study make a finding of a significant effect. But that goes to our argument that we don't need to show certainty. We just need to show that there, or the FCC decides that there may be significant effects. And we've submitted, as other parties have, sufficient evidence and testimony that there are significant effects. And even if the FCC doesn't necessarily agree that for sure there are, the argument has been made and the evidence introduced that it's hard to ignore and not conclude that there may be significant effects. And that is the MACE standard. And that's all that we necessarily need to show here. And that's all that needs to be done to require an environmental assessment. But the MACE standard, as you call it in your brief, is, I mean, the FCC makes the determination. It's not, it doesn't say that if comments are put forward suggesting that this may have an effect, that they have to order an environmental assessment. It's a determination that has to be made by the commission. The commission needs to review the petition and consider the environmental concerns. And if it determines that it may have a significant environmental impact, require the applicant to prepare an EA. But that's where we bring in the APA, because you are correct that it is its determination, but it can't just dismiss or facially address the issue and not substantively consider all the aspects brought before it. And we contend that's what happened. It's one thing to put in a lot of words and recitate, which it did, the number of parties and evidence introduced by Dark Sky, as well as others, and go through and then say, for example, Judge Ginsburg in reference to the ESA, say, well, there's this report out here that suggests that there's no determination right now that there is a reasoned analysis that the APA requires. And it's really an arbitrary and capricious treatment of these particular issues to reach the conclusion. So, yes, it is the FCC's conclusion and decision, but the APA requires something more than just a recitation of the arguments and saying we decide this way. It needs to give that reasoned analysis. I see that my time has expired, and I'll address any other questions that you may have. Otherwise, I'll conclude on my rebuttal. I do have one more question. Do you think that we need to decide here whether NEPA applies in space? I don't think that needs to be decided. Personally, I do. I mean, we do, and the IDA does, but I don't think that that's necessary to be decided, because as I began my argument, the focus here are the effects on Earth terrestrially. And that goes to the fact that these are satellites that are manufactured, operated, controlled from Earth, and so forth. And the effects that we're talking about, particularly with respect to the night sky, those are effects that we feel here on Earth terrestrially. Any further questions? Thank you. Thank you, Your Honors. Your Honors, may I ask first? I think I've never had an exhibit, yeah. I think Josephine has his own. May it please the Court, Pantelis Michalopoulos for this. I would like to reserve one minute of my time. My colleague, Andrew McLaughlin, will be helping with handling the exhibits. The FCC and SpaceX defend the order below by resorting to ideas invented after the fact, allegations of harmless error, and a claim made by SpaceX about a favorable finding of the foreign body, the ITU, that shows everything that is wrong with this private subdelegation, because it is the wrong finding for the wrong system. The FCC disregarded this as evidence that SpaceX's generation system would flunk the limits. And to be clear, we're not questioning the ITU limits themselves or their incorporation by the FCC. But we applied the ITU method. We applied the ITU software without any modification. Now, the FCC says that there were reasons to doubt our showing, but no such reasons were expressed in the order. It's the brief's invention. The brief says, well, there had been no reports of harmful interference from the first generation system, which had been lower power. But finding harmful interference in this case is like a game of whack-a-mole when the moles are invisible. This, and this is our first exhibit, is what the SpaceX system looks like. We don't know where the customers are. The DISH ITU analysis, though, analyzed SpaceX's submission as 18 separate submissions, right? Whereas the ITU analysis would have treated them as one. Yeah, we rebutted their efforts to split the system in 18 and we combined 18 into one. Then the FCC required SpaceX to submit a combined showing. We analyzed that combined showing as well. So it was not we who split it 18 ways, it was SpaceX. So we don't know where the customers are. We don't know where the satellites are. We don't know whom to knock on the door of among our subscribers and say, tomorrow you may lose your football game and please give us a call. So the FCC ignored our evidence only on the ground that it is the ITU's job to look into compliance. But the FCC knew how to look into compliance when it wanted to. The first showing, and that goes to your question, Judge Rao, the first showing by SpaceX of compliance was made indirect. And what did they do? They split the system 18 ways in order to shoehorn it in the Olympics. That's what they did. And we said that this is like me claiming to break the world record for 100 meters by running from here, I guess where Judge Ginsberg is on the screen, in nine seconds. And we said that if you put together, we put together the 18 constellations, and if you put them together, you vastly exceed the power limits. But all of this was overtaken by events outside of the record. Because the FCC had concluded that this first showing of SpaceX was inadequate. And we know that because the order asked SpaceX to ask the ITU to consider the joint system. And the FCC picks up the phone and calls SpaceX and says, you need to submit a second showing. So before washing its hands of compliance, the FCC had kept its hands in the soup, or at least tasted the soup, but in a kitchen closed to the public. So why though, is this not a collateral attack on the FCC's regulation that decided to use the ITU standards? So that was already established in the rulemaking, you know, the FCC made a determination that they would rely on ITU standards. So why is this not a collateral attack on that, which would not be permitted in this licensing? So for two reasons. First of all, we're not questioning the standards themselves. We're not questioning the incorporation of those standards by the ITU. We're questioning the disregard for our evidence that the standards are met. Second, and this was the Viasat case, what Viasat faulted DISH for doing was saying, the methodology of the ITU needs to be improved. We are not saying that. We're saying, apply your rules. Apply the methodology that the rule says ITU approved software. We applied the ITU approved software without any change. So we're saying to the FCC, put that in the record. The FCC says, no, we will not let you evaluate this new showing. This was the combined system showing that Viasat. And the FCC said, no, on the astonishing ground that it didn't consider the substance of the submission it requested. And the FCC says, well, in its own very defensive words, we requested it for the facilitation of preparation for coordination. But the problem is this is a smokescreen because the substance of the coordination is the same as the substance of the proceeding. I mean, SpaceX merely has to certify that it would pass the ITU standards. Yes, this is the first step. Right. So looking at the certification doesn't require the commission to actually look at the ITU, you know, running the software. Well, I mean, isn't that right? I mean, that's the sort of a way to, and you say you're not challenging the FCC. We're not challenging the FCC. It has in front of it evidence that something is wrong. The, you know, SpaceX had to split the system 18 ways to make it fit. And the FCC looked at this and said, well, something is wrong with that. So it didn't wash its hands right then. It knew enough to assess compliance a little bit. But when such evidence is there, you don't blind yourself and say ITU, ITU. The rule only says that the ITU finding will be a condition. It doesn't say the FCC will do nothing more and would blind itself to evidence to the contrary. And so the substance of coordination, because the FCC says we only request that the submission for the facilitation of coordination, the substance of coordination is the same as the substance of this proceeding. If the FCC's regulation suggests they can look behind the certification or, you know, evaluate anything at that stage, just suggesting that it's sort of a matter of reasonableness. Yeah, as a matter of reasonableness, when we have, when they have evidence that something may be strange here, that you need to split your system 18 ways to make it fit, they looked at this and they should have looked at this and they should have done more. There's nothing in the rule that prohibits them from doing that. So they're saying we're not putting in a public record on a separate exportation. We're not putting it in a public record because we only request for coordination, but the substance of coordination is about power limits, the same substance. In other words, in coordination. Counsel, if the FCC looked at the evidence that it supports compliance, it would still, I believe, have to send the matter to the ITU and the ITU would make its own determination. Is that correct? In that case, yes. Suppose the FCC looked at it and said, this does not comply with the ITU. Then what it would not send it to the ITU. Is that what you're saying? Well, since the FCC represents SpaceX in the ITU process, that's what coordination is. The FCC would have to call the ITU, file a submission and say, this system meets the limits. If based on our evidence of the infirmities of the second showing, the FCC was not convinced, it would have to make a different submission to the, to the ITU. Either go back to SpaceX and get a different showing or say to the ITU, we have reservations about this. So that's what we have. Reservations. And then the ITU would perform an independent determination, correct? Yeah. And ultimately, whatever the FCC thinks, the ITU is going to be dispositive. And the purpose of the rule and the scheme here is to get the service into, to the public wheel and to avoid delays. Am I correct? Well, your honor, you mentioned that the ITU's finding would be dispositive. First of all, one hopes that the ITU would take into account the FCC's views, even though the FCC cannot tell the ITU what to do. But the dispositiveness of the ITU finding is one of the major problems we'll have with sub-delegation. But that's the rule you say you're not attacking? No, not your honor. We are attacking the sub-delegation. Seems to me you're actually asking the FCC to depart from its rules. No, we are attacking sub-delegation as the rule has been applied here. We don't have any problem with the rule per se, but if the rule were to mean, which we don't believe it means, that the do something, nothing more, you know, beyond punting to the ITU, then that's an improper sub-delegation. And as far... How would your sub-delegation claim an as-applied challenge? I mean, if the FCC had impermissibly sub-delegated to the ITU, wouldn't that be a facial challenge? I mean, that would mean, I mean, that would, that would be a challenge. That's a challenge to the regulation, you know, on its face. But you can't have an impermissible sub... How do you have an impermissible sub-delegation just for one party, as applied? I don't... Senable condition, fact-finding, advice-giving, the agency has final say. If the rule of the FCC, which we respect, were interpreted as we think it should be interpreted, show us to give the FCC the final say, then this would be permissible. If the agency does not have the final say, this is unconstitutional. And that's the respect in which this is a challenge to the rule here, if it's applied to not give the agency the final say. And so, the FCC argues harmless error, but we had all of one business day, not before the order, before the deadline on consideration, to look at the new short. And... I have a question about this, whether DISH forfeited its argument on sub-delegation, because the FCC does discuss the sub-delegation issue in its order, but at least in the record before us, I don't... Where did DISH raise that argument? Oh, we made the argument, and I'll get you the side. It was raised in paragraph 28, in response to our raising the issue. So, we very specifically raised the sub-delegation issue. They don't... The FCC doesn't fight to anything in it. Well, it should have. Yeah. So, if you could give me that slide. Yeah, of course, of course. And so, but the FCC has already said that whatever DISH says will not affect our decision, because the showing is sort of immaterial after having requested it. Now, the harmfulness of the error is shown when we were finally able to analyze the second showing. That was after the onset. That was in March of 2023. And what had happened was SpaceX had resorted to another trick. It had used a different exclusion angle than used in the ITU software. And SpaceX tries to demote this to a hyper-technical matter, but it has a very simple effect. The calculation includes only power from those satellites that transmit hardly any power at all. So, it's very easy, then, to show that the system does not exceed the power limits. And SpaceX trumpets three times this famous favorable finding of the ITU in its brief. It says, it ends all speculation. It makes the issue moot. It's not for the second generation system. This is not accurate. This is a favorable finding for a system filed by SpaceX back on October 7th, 2019. And you can find that in Joint Appendix 264. May it please the court. My name is James Carr. I represent the Federal Communications Commission. I will be addressing the issues raised by DISH Network, and my colleague, Rachel Proctor-May, will be addressing the issues raised by the International Dark Sky Association. So, let's start with first principles here. This court has long recognized, as it's stated in the Biostat opinion, that the FCC must adhere to its own rules and regulations. And that's precisely what the FCC did here. Judge Rao, as you pointed out, under the FCC's rules, the first step for an applicant for authorization of a satellite system like SpaceX's is to certify that that system will comply with the ITU's rules using the ITU software. SpaceX did exactly that. SpaceX was not required under the rules to submit any sort of technical analysis to the FCC, nor does the FCC, as it has made clear when it first adopted the rules, the FCC itself does not engage in technical analysis. And it doesn't look at if a third party, such as DISH, were to present technical analysis, it doesn't look at any of that either. It treats the certification as binding. Of course, the certification remains subject to ITU verification later, which is exactly what happened in Biostat. SpaceX certified, the FCC accepted the certification, and at some later point, the ITU confirmed that SpaceX had accurately certified. What about those cases indicating that FCC can't just rubber stamp these issues with respect to the certification? In other words, self-certification can be okay standing alone, but when there's a challenge substantively to it that is not intended to cause delay or anything of that nature, why wouldn't the FCC address it, even if it discounted it? Well, Your Honor, again, going to the rule, if the FCC were to require SpaceX to grapple with DISH's study, that would be imposing additional requirements on SpaceX, which are beyond the scope of our rules. I will note, and DISH makes much of a particular case, Animal Legal Defense Fund, where it points out that the court in a particular circumstance said that it was arbitrary for the agency in that case to rely on certification. But that was a very unique case. As Judge Edwards described it, it was a smoking gun case, where the agency itself had direct knowledge that the facts certified by the applicant simply were not true. It knew for a fact that the certification was false. So if the FCC had information like that, would it have to look behind SpaceX's certification? I think if it actually had certification or had knowledge that SpaceX was making a misrepresentation, it would have to. But again, DISH Network's submission is not that type of smoking gun case. Here's the difference. In Animal Legal Defense Fund, it was the agency's own experience with the regulated entity. In that case, the agency had already engaged in a number of enforcement actions against the particular applicant. So the agency knew from its own experience. I mean, an agency could get knowledge from its own experience or perhaps from a third party. So why is their submission not adequate to cause the FCC to look behind the certification? I think, again, Your Honor, if you look to past cases, and this court has recognized in the Global Crossing case, for example, that the commission has relied on certifications in the past, and that's a permissible exercise of its rulemaking discretion. If there's information presented to the agency that the certification may be faulty or misleading, so in what circumstances would the agency have to look at that? I think the Animal Legal Defense Fund case gives you a circumstance. That would be where the agency knows. It may well be, Your Honor, if it's simply enough for a third party to present evidence that suggests that there's some problem. That ultimately defeats the purpose of certification. The certification process is designed to prevent long delays and to move the process along. Now, certification is only reasonable if there is a backup, if there is subsequent verification, which we have here. The ITU finding that is required by the commission provides backup. Ultimately, if DISH is correct that there is some sort of problem with SpaceX's certification, the ITU will make that finding, will make an unfavorable finding, and SpaceX, assuming it has commenced operations before the ITU finding, proceeds at its own risk. If there is an unfavorable finding, SpaceX is going to reconfigure its operations. A practical question. The FCC has to determine whether a satellite would have unacceptable interference. That's the standard. That's right, Your Honor. Under the regulation, rely on ITU to make that find. You rely on ITU standards. And the commission incorporated by reference the ITU rules. It made an independent determination that compliance with those rules would satisfy the obligation not to cause harmful interference. Does the FCC do anything else? Once it gets the ITU's finding that a particular applicant meets their standards, is there anything else that the FCC does in its process to determine whether there would be unacceptable interference? No, at that point, there wouldn't be anything the commission would do. Although, keep in mind, and Judge Katsas and the bias set opinion made this point, which is that if there were evidence of actual interference, regardless of an ITU finding, if there were evidence of actual harmful interference, the commission would take action to eliminate that. But in the actual process, the FCC doesn't take any further action once it has an ITU finding. That's right. And the reason, Your Honor, is that when the commission adopted these rules, it explained that once it gets the certification, if the commission staff were to do this sort of analysis using the ITU software and confirming the certification, that would essentially duplicate the ITU's process, because we know that the ITU is going to have to do that process to ensure international coordination. Just ask you one other special question I didn't see. Yes. What is, do we have any kind of treaty obligation to follow the ITU, or is there any other kind of formal relationship that the United States has with ITU? Because, I mean, there are other cases in which, you know, there's an of that nature here. Does the U.S. participate in the ITU standard setting? I'm just curious. My understanding is that, yes, there is a treaty or agreement where the United States participates in the ITU process. So there isn't, like, executive agreement, formal agreement? I don't know for sure, Your Honor. I do know that the, the, typically, the way this ITU process works is that different nations serve as member countries, and they provide, when a company comes to them with an application, the FCC... I mean, it's useful for the FCC to mention that. I mean, in terms of whether it's implementing other international agreements that the federal government has. I understand, Your Honor. I believe that our intervener made some reference to the treaty obligations of the United States, and I apologize that the Commission didn't mention that. But the way this works is that the FCC, as the member administration, would pass on to the ITU whatever filings SpaceX made to the FCC. So it serves as a conduit, which, again, goes to this point about the combined file, which has been a source of great confusion in this case. The Commission requested the combined file of SpaceX because it wanted to make sure that the ITU had a complete record when it examined the question of whether or not the SpaceX was in compliance. For that reason, the Commission did not actually rely on the substance of that file at all. It did not look at the substance. It simply regarded when it approved this application, it relied on certification. It didn't consider the substance. And therefore, the ex parte rules, the FCC's ex parte rules did not apply because the filing did not go to the merits of the outcome of the proceeding, did not influence the Commission's judgment in any way. And therefore, there was no need for the Commission to make that available for someone else to comment. And as we've said before, the notion of third party comments on this going to interference analysis is inconsistent with the way the rule is structured. The first step is we accept the certification once a party is certified. And we have reason to believe that the certification is accurate because, among other things, parties that certify, if they are wrong, are subject to severe penalties. For one thing, SpaceX would have to reconfigure its system. For another thing, there could be fines and penalties for inaccurate certifications. Well, we would find out from the ITU. The ITU will confirm the certification. So if the ITU makes an unfavorable finding, then that would mean that the certification was incorrect. That would require SpaceX to alter its operations to come into compliance with the limits. And it could conceivably result in further penalties. So you're suggesting that FCC is not involved in that process of looking at substantive information that actually challenges the certification process. That's supposed to go through ITU. That will go through the ITU under the way the rule is structured. That's right, Your Honor. The ITU will take the data files that have been submitted by the commission on behalf of the applicant, SpaceX. It will use the software and apply the software to the data files and make a determination as to whether or not it complies. And what's actually involved in ITU running the software? Because we have this issue about, should we evaluate this information singly or jointly? Well, the commission itself made a determination and it conditioned this authorization on SpaceX obtaining a finding from the ITU that explicitly states that the ITU has considered the joint effect of SpaceX's operations. And that's because I think the commission was concerned, and it wanted to clarify this, that the comprehensive effect of the satellite system was going to be taken into account, not that you were looking at 18 separate filings. Now the commission addressed, I believe it was in paragraph 31 of the order, the argument that Dish made that somehow the 18 separate filings were an attempt by SpaceX to the system. SpaceX explained, and the commission accepted the explanation, that the ITU staff itself had suggested that sort of segmentation. And the reason for that was, again, this goes to a different analysis. This goes to power flux density as opposed to equivalent power flux density. When the ITU examines that particular issue, which involves the potential for interference to terrestrial operations, it needs to have the file segmented in order to examine that. That's what, and I'm sorry, go ahead. Help me out with what essentially could be a conflict in the order, because it says the order requires SpaceX to get a finding from the ITU that expressly indicates that the ITU has considered the joint effect of SpaceX's ITU files. Yes. But then the system into 18 separate ITU filings is reasonable. And for just the reason I was explaining, Your Honor, that SpaceX consulted with ITU staff, and ITU staff told SpaceX that it preferred segmentation precisely for the analysis of a separate question of power flux density. But as to equivalent power flux density, I'm sorry, Your Honor, go ahead. I guess you wanted to see the data both ways, sliced at 18 and then combination. I think that's right, although I don't know that the ITU made that entirely clear. And that's part of the reason why the commission asked as a follow on for SpaceX to submit a combined filing that that could then be run through the system that would confirm that the joint effect of the system would be in compliance with the relevant power level. But then help me with the subdelegation issue, like who's actually making the decision about joint effect versus... Sure, Your Honor. Okay. Remember, when we're talking about subdelegation, we're talking about subdelegation of regulatory authority here. The FCC exercised its regulatory authority in the first instance, when it made an independent judgment to incorporate by reference into its rules, the ITU's power limits. And it made a determination that compliance with those power limits would satisfy the obligation not to cause unacceptable interference. Under this process, it then relies on input from the ITU, which this court described in 2004 US telecom cases, legitimate outside party input in two respects. First, the ITU finding is a reasonable condition on the authorization, because after all, the whole point is we want to confirm that these folks are in compliance with the power limits so that they won't cause harmful interference. The ITU finding does that. So it's a reasonable condition on the authorization. Second, we would argue that the ITU's information provided to the commission amounts to fact gathering. It's factual information. It addresses the factual question of, is SpaceX in compliance with the power limits or not? And under this court's case law, under the US telecom case, that is an acceptable use of outside party input, and it is not an improper subdelegation. What was the point of directing SpaceX to release the information after the fact? Your Honor, the disclosure requirement was a condition that the commission adopted as part of its decision to grant the partial waiver of the rules to allow SpaceX to go ahead and operate before it obtained an ITU finding. It's my understanding the point of that was to provide transparency to outside parties. They could get the information. They could run it using the software and make a determination for themselves as to whether or not it's satisfied. I think it was meant to put people's minds at ease. Now, DISH took the information, ran it through the software, but it looked at SpaceX's inputs and it said, well, SpaceX got this wrong. So it altered SpaceX's inputs. I don't necessarily think that DISH disagrees with the notion that if the ITU were to take SpaceX's inputs as is, ran them through the software, they would show compliance. DISH has a quarrel with SpaceX about how it put together the inputs. But be that as it may, suppose they look at the data or some other party looks at the data and says, well, this does not show compliance. Can they present an argument to the ITU? They cannot present an argument to the ITU, but what they can do and what DISH has done in its March 6th letter, March 6th, 2023 letter, which is in the joint appendix, DISH went to the commission and said, FCC, we have evidence that this is out of compliance, that SpaceX hasn't complied with the ITU rules in putting together its input. And you, FCC, as the relevant administration should make clear to the ITU that this is the problem. So they would have the opportunity to come to the FCC and ask the FCC to go to the ITU and raise that issue. And they did. DISH has done that. The FCC has not yet responded to that request. I think part of what's going on probably the FCC is waiting to see what the ITU is going to do with the file and whether in fact it will confirm compliance. Isn't that peculiar to me? If they wait for the ITU to confirm compliance before forwarding a letter that says that for reasons that you may not have thought about, it's out of compliance. Well, I think if I understand it correctly, the disagreement between SpaceX and DISH as articulated in the March 6th letter goes to how the ITU's particular rules apply for putting together the input. So I think the assumption is that once the ITU takes a look at the input files, if it has a different view, if it shares DISH's view that there is a problem with those files, that will come out in the analysis. But they would have to make that determination without the benefit of DISH's approach. That's right, Your Honor. Yes. But they will have all of the other files. And part of DISH's argument is that SpaceX's combined file is somehow different from the system it was describing in the 18 separate files and that it used a different avoidance angle, a technical term that essentially relates to the way the transmission beam is directed to an earth station and the potential for interference is related to that. Again, I think the information is all in front of the ITU. And if it believes there is a problem, presumably it's going to find that problem. Now, when the SEC incorporates these ITU standards into its regulations, does that also include any kind of future discretionary decisions that the ITU may be applying with respect to standards? Well, Your Honor, if the ITU were to under consideration to actually raise the power levels, if that were to happen, the commission's incorporation, by reference, refers specifically to the 2016 version of the rule. So the commission would have to go through another procedure to specifically adopt the new limits. So this isn't a process where if the ITU keeps changing its rules, the commission would just blindly apply them. This is focused, the incorporation was to a specific rule adopted at a specific time. And I just want to be sure, on that expert report, you're saying the SEC would not be looking at the challenge, only the ITU would, and then it would either get certification or not? The FCC wouldn't look at DISH's materials or any third party's materials. And the ITU, just to be clear, what the ITU has before it is the SpaceX files that the FCC has passed on. It does not have DISH's competing report. But what the ITU does have, of course, once it has SpaceX's files in front of it, it can apply its software. And if it finds, as DISH claims, that SpaceX has put together its files in a way that is contrary to the ITU's rules and procedures, the ITU can make that finding. Do you believe that... So did DISH preserve this issue before the FCC, in your view? Which issue, the sub-delegations? As I understand it, and I did review this issue, I don't have the site in front of me, Mr. Michelopoulos can provide it, but I am relatively certain that DISH did preserve this issue because it learned from Tobias that case where it didn't preserve the issue and tried to raise it. And the court quite rightly dismissed that claim under Section 405 of the Communications Act. We don't believe that that sort of forfeiture happened here, which is why we didn't raise the issue. If there are no further questions, I'm sorry. Go ahead. Go ahead, Your Honor. Does FCC have no duty to look at any information that would undermine ITU self-certification? Does the Commission have any duty to... Again, Your Honor, I think its only duty here would be consistent with the Animal Legal Defense Fund case. If the Commission knew based on its own experience with SpaceX, that SpaceX was making a misrepresentation here, it could take action. It does not look at third-party studies or reports. And I think it's relevant... That's inclusive of waiving any pre-certification requirement or pre-approval of requirement? I'm not sure if I understand your question. It seems like there's kind of two steps, like you would have your self-certification, but then you would also, before the launch actually occurs, there's another step in there, so you wouldn't even look at it then before the launch. We would not look at it before the launch, but again, as the Commission has emphasized, SpaceX would proceed at its own risk under the partial waiver because there's a possibility if it launches and then the ITU later makes an unfavorable finding, then SpaceX will have to reconfigure its system to come into compliance. It takes care of itself in the process. Yes, which is precisely what the court found in Viasat. And Dish claims that this case raises a new issue in that it claims that it's raising an issue that this waiver has left it unprotected for a period of time. If you go back to Viasat, the court actually considered that argument because Dish said, you know, a future finding by the ITU doesn't do anything to help us if there is present interference. And the court said, among other things, first of all, the certification itself provides some assurance of no harmful interference. Second, if there is an unfavorable finding at some future point, that will require SpaceX to come into compliance. Third, in the meantime, while ITU review is pending, there are still regulatory channels available if there is actual interference for a party experiencing interference to report it to the FCC and the FCC and its Enforcement Bureau would then take appropriate action to eliminate that for a long time. Any further questions? No, thank you. Thank you. Thank you. Your honors. Good morning and may it please the court. I'm Rachel Proctor-May for the FCC and I'll be addressing the issues that are raised by the International Dark Sky Association. And if I could, I would like to proceed straight to the merits. The standard as your honor recognized is whether there may be a significant effect. The standard is not whether there may be any effect at all, because that would set a bar that is so low as to be meaningless. And the commission reasonably concluded and reasonably explained that as to each of the categories of effects here, that standard was not met. As to astronomy in the night sky, the commission looked in detail at the record, both for the NEPA question and under its obligation to ensure that this license was in the public interest. And it assessed the advanced technologies in the SpaceX Gen 2 satellites, which were specifically engineered to minimize brightness. And it imposed a number of license conditions that were aimed at further minimizing effects on astronomy in the night sky. As to re-entry effects, the commission reasonably relied on two studies that were commissioned by the European Space Agency, and it explained why it relied on those studies. And then of course, as to launch emissions, the commission relied on the series of environmental assessments that the Federal Agency conducted. I know the commission said it wasn't resolving the question of whether NEPA reaches into space, but I mean, isn't that a threshold inquiry? I mean, if we're going to reach the merits, I guess you don't want to talk about standing, but I mean, if we found that there was standing here and we reached the merits, I mean, isn't that a threshold question we have to decide? So, I mean, as you recognize for purposes of this appeal, NEPA applies because that's what the commission assumed without deciding. But we don't see that as a threshold jurisdictional question. It's really a separate statutory question. So the question that the commission answered is whether there may be a significant effect. And so, because there was no significance, it didn't have to go to the second step and ask whether any of the effects of the space activities are effects within the scope of NEPA in the first place. So one of those questions doesn't necessarily have to precede the other. Do you think NEPA does apply in space? The commission didn't reach that question. It recognized that there are novel issues that are a source of reflectivity within the scope of NEPA, that how does the extraterritoriality principle apply? What do you do with effects that are purely in space, such as orbital debris? But again, the commission did not reach that question. Can you just help me understand the redressability question here? So the FCC is one of the many satellites, right? So if, I mean, how is there redressability here? I mean, if the FCC were to do an environmental assessment, as the IDA petitioners want, and say the license wasn't granted, would that redress their harms, you know, harms of light pollution from a satellite already having been launched into space? So as you recognize, there are two licenses here. At least two. The Federal Aviation Administration licenses the launch of the rockets that carry the satellites to space. And so then once it's up there, the satellites are released into space. And what the Federal Communication Administration licenses is deploying and operating those transmit communications, which is their purpose. So if they were sent up there, would they be dark? Like if the FCC didn't, I mean, I mean, I guess, I think would not then redress their problem. Well, I think, I think the question would be whether SpaceX would have a reason to send them up in the first place if they couldn't be used for anything. And I don't know whether they everything is finalized with the FCC. And if the FCC determined not to license, or to take back their license, would that redress their harm? If the, I'm sorry, Your Honor, if the license were rescinded at some point in the future, when the satellites are launched. So, right. So, so the satellite is launched. And then say the IT, you know, something comes back, or they just determined that there are environmental effects. Right. So they revoke a license, pull back a license. Would that, would that affect their harms? I mean, to the extent that they could, that SpaceX could no longer use the satellites for these communications. Yes, the satellites would still be up there. And there are about 1500 satellites that are up there already. There was no stay in this case. And so if the FCC license were to be taken back, would that prevent the light pollution? Would the satellites have to come down? I mean, you know, the redressability here is very murky. Without wanting to make association arguments for them, I think standing is typically assessed at the time of the, of the action. So I'm not sure if the fact that it might be revoked in the future undermines their standing. Not that it would be revoked in the future, but what they're seeking essentially is a NEPA analysis that might cause the agency to make a different decision. And so the redressability, they have to show some causal link between doing environmental assessment and, you know, that being able to redress their harms, which, you know, one of their harms is light pollution. If there were, if the, I mean, there's two ways that this could turn out. There could just be a remand without vacatur, which we agree with SpaceX would be appropriate if we even got there, which obviously I don't think that we should. But if if the license were vacated, then I don't think anything would require the satellites to be taken down. I do not think they could be used for their intended purpose. And if they were used, would they no longer create light pollution? I think that's a very difficult technical question because a lot of what affects the light pollution is they're metal satellites that have specific coatings on them that have specific reflective characteristics, which of course were engineered to be very minimally reflective. And they also operate in certain ways to minimize reflectivity. So there's a big solar array. It sounds like it turns on whether they're transmitting. It's just the satellite itself. That's correct. So maybe there isn't redressability here. We haven't addressed standing. We don't have a problem with the court deciding on standing. Now would one causal link be that the FCC could have had more stringent conditions? In terms of mitigation? The commission definitely has a lot of options at its disposal. If the Gen 2 satellites don't perform as they're expected or if the brightness mitigating technologies don't work as expected, the commission could enforce the conditions that it imposed. It could modify or even revoke in a very extreme circumstance the license. I don't think anyone thinks that would happen here, but it is an option and it can impose rules. So there are all sorts of things that could happen in the future that might affect how that might affect how these satellites perform. But what the commission did conclude in this case is that, in this order, is that this set of mitigating technologies and license conditions would be sufficient to avoid significant effects. And it relied on an extensive record. It explained why it was relying on what it relied on. And that's all that is necessary to uphold the order. And we would ask that the court see that. And if your honors have no further questions? Any further questions? No, thank you. Thank you. May it please the court. I'm happy to address either set of issues. First, the NEPA or the DISH, if the court has a preference. Okay. And then let me start with the DISH issues. I think that your honor, Judge Rao has it right. The real beef is with the FCC rulemaking in 2017 that adopted the ITU certification verification methodology. But this court made clear just last year in BIAFAT that DISH cannot collaterally attack that regime and licensing. And they have several different arguments that they try to say it's not a collateral attack, but each of them boils down to a collateral attack on the regime. If you actually apply the 2017 rulemaking as it's you have step one, the DISH self-certification. And by the way, I'm sorry, the SpaceX self-certification and SpaceX made the self-certification on both submissions on the 18 separate files. First said, look, that satisfies it. And then when the commission said, actually, we want to make sure that you're combined in one file, does it? They made another self-certification that they put it together as one file, ran the ITU validation software and certified it is an FCC relied on that certification. The very one that DISH is asking for that it be one aggregate file. So how are DISH's results turning out differently? So, right. Maybe judge, yeah. So again, this is not in the record that's before you, because they wrote this in a March 6th, 2023, but it is in the JA, if you want to see that letter and what, and you can confirm this with DISH's counsel. But my understanding is they don't actually disagree that the files that SpaceX submitted will get an ITU validation because SpaceX ran the software, the same software and got the green, let's just say green light, right? They got the green light and they don't dispute that in their March 2023 letter that, in fact, it does comply with ITU validation software. My understanding of their objection is they say, look in the input files, SpaceX, contrary to their reading of ITU rules, use different angles for the mask angle and the avoidance angle and say that angle has to be the same and SpaceX use different angles. Now, SpaceX will tell you, no, you don't have to use the same angles. And in fact, ITU has approved many different constellations that don't, in fact, use the same angles. And it doesn't make sense to use the same angles here based on how SpaceX runs its system. That's obviously a technical disagreement based upon interpretation of ITU rules based on their own. It's a disagreement about what inputs go into the ITU software. Yeah. Of the inputs that are in the files, they read the ITU rules differently. This is like the quintessential reason why the FCC in its 2017 rulemaking said, we are going to let the ITU apply its own software to the files. If they are right that the ITU rules require the same angles, obviously ITU will see that in the file that they use and they can adjust it and ITU will make that known. And so this is exactly the sort of thing that FCC said, and it explained this. It had a full notice and comment rulemaking in 2017. It got a lot of favorable comments. It got a lot of objections. DISH did not participate, didn't participate, didn't submit comments. In that 2017 rulemaking, at the end of the day, the commission said, look, we're not going to even ask for the technical data files because if there are technical disputes, the ITU, which does this not only for the United States constellations, but it does it for every country. It's a UN, ITU is a by applicant space. The U.S. doesn't have a monopoly on space. There are foreign licensed satellite constellations. There are U.S. licensed constellations. And that's why it makes sense to have an international, not only adopt the international standards, but it's common sense that you would want the entity that created those standards, that's fielding applications from countries around the world to be the one that runs it. So it runs it in a uniform manner and resolves these sorts of disputes. Can you answer the question I asked FCC counsel, which is, is there like, is there a formal relationship, like legal relationship between the U.S. and the ITU, a treaty or executive agreement? Yeah, so I am not aware of like a, you know, a Senate confirmed treaty. Some executive agreement. Right. What I do know is that this rulemaking obviously has the United States through the FCC's rulemaking makes those ITU standards binding. They do have participants that participate in the conventions that come up with these ITU standards. I don't know formally whether there is a formal, you know, agreement beyond what FCC has agreed to to make their standards binding. Was there the issue when you were talking about the angles with respect to the 2016 ITU decision before the FCC adopted it? The 2016? No. In the 2017 rulemaking proceeding, as I understand it, that was when FCC said we're going to incorporate the ITU standards and then we're going to have the verification done by ITU. Presumably then ITU would adopt whatever procedural rules it has and apply those to whatever verification. But I don't recall any specific discussion about that particular rule that DISH contends SpaceX is interpreting incorrectly and SpaceX contends DISH is interpreting incorrectly. If there are no other questions on the DISH aspect of the case, I'm happy to shift to the NEPA aspect of the case. And there, Your Honor, you know, I think it's pretty straightforward. The court is not assessing de novo whether all satellite constellations past and future pose any conceivable risk of any impact. The regulatory framework here is pretty clear. There's a categorical exclusion. The agency, again, did that through notice and comment rulemaking. And again, you heard counsel for IDA call that an antiquated assessment. Again, you have essentially what's a collateral attack on the categorical exclusion. The categorical exclusion says these sorts of activities ordinarily don't have a significant impact. That's step one. The FCC regulations then allow a challenger to overcome that categorical exclusion. But it can only do so if it, quote, steps forth in detail, end quote, that's the FCC regulation, how the particular action at issue may still cause a significant impact notwithstanding the categorical exclusion determination. So that means here IDA had to show why the 7,500 satellites that were actually approved based on its record with all the mitigation and compliance conditions, why it could still have a significant environmental impact. And then we get to step three. That's traditional APA determination that, hey, did the agency look at the evidence? Did it consider it? Was it arbitrary and capricious in saying whether it satisfied that standard or not? And here we're not even close to the arbitrary and capricious line. It looked at all the evidence. It made a considered judgment. And they're legal. They do make one legal argument beyond arbitrary capricious, which is to say that you can't look at mitigation. They say mitigation is indicative that there will be a significant environmental effect, but that's contradicted directly by the CEQ regulation on NEPA. And CEQ is the body that is primarily in charge of NEPA. That's at 40 CFR 1501.4B1. And that regulation says, and I'll just read it to you, if extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects. That's precisely the determination that FCC made here. They said, look, with all the mitigating conditions, including the ones that we're adding to the license, here you are not going to get the significant effects. And that is the record on which this court should assess it. Thank you, Your Honor. I have a rebuttal from Mr. Mudd. Thank you, Your Honors. I'd like to briefly address a few points. One, we are considering or talking about significant effects, not just effects. And while there was a comment made with respect to the categorical exclusion, the attack on that's not necessary here. But I'd really like to focus back on the questions that you've raised. To begin with, the substance of harm for IDA arising from the unlawful order is the allowing significant environmental effects, principally the diminishment of the dark skies, and thereby affecting its interest in protecting the dark skies. Clearly, these fall within the definition of human environment. And the NEPA analysis extends the cultural and aesthetic issues and focuses on the present and future generations of Americans. Now, you've raised two issues. Essentially, part of your question, I think, is even if we look at this and the FCC reverses its order, which I would first say that the redressability issue largely can be overcome under Wild Earth by simply analysis, is the agency should change its mind if it adequately considers the environmental concerns. And we argue, yes, it could deny the application. It could order additional mitigation requirements reaching the ideal magnitude that astronomers would like in terms of brightness, could limit the number of satellites and thereby minimize the impact. But what are those satellites already launched? One, they could not launch anymore. But as to those that are already up there, if they're not operating them, just as SpaceX does on orbit rise and turn the satellites so that the solar reflectivity is significantly minimized because they're not yet using it, they could do those, do the same thing with the satellites that are already in orbit should the FCC change its mind. And I see my time is out. So, I thank you all for hearing our arguments. Thank you, Mr. May, please, the court. And let me start with J.A. 230 is where actually SpaceX rebuts our non-delegation arguments for some reason and then and sides to September 21 letter that we found for some reason, the letter is in the record, but do not find it in the joint appendix. But there's a letter where you write that issue. Yes. Yes. Yes. And so you could submit that. Of course. So on some delegation and rubber stamping, I heard neither counsel for the FCC nor counsel for SpaceX tried to rebut the fact that what they presented as the favorable finding that resolves the issue makes it moot is for the wrong system. System was filed in 2019. So it doesn't indicate that the FCC has combat has considered the combined generation two system because it didn't. And therefore, they have not communicating the finding to the to the FCC as they would have had. And so where does that leave us? And that goes to the heart of rubber stamping. The FCC cannot do anything, cannot subordinate the FCC. I'm sorry, the ITU subordination is, of course, a crucial test of what is an improper subdelegation. Dish cannot do anything. We cannot go to the ITU as Judge Ginsburg was asking and say, look, your rules are being violated. You should not ignore that. We cannot appeal the finding. And this makes us indistinguishable to the public in the Gutierrez case, the Judge Santel case about the weights where Judge Santel said you cannot punt. The Coast Guard cannot punt to the International Maritime Organization for the vessel routing direction on how to not kill weights. Why? Because this would rob the public of its right to challenge those determinations under the Endangered Species Act. That's what's happening here. And so if there is improper subdelegation, it's unconstitutional. And to the extent that the rule implicates this subdelegation, it's not correct or concordant with the Constitution. Now, we don't believe that the rule needs to be read that way. And that goes to the colloquy that you and I had, Judge Rao. After the 18 ways, Judge Ginsburg, you asked the question about whether the ITU might have wanted to see both. The answer was not quite accurate. To give SpaceX the benefit of the doubt, this 18-way arose from some difficulty in another band, the KA band, not the 12-gigahertz band. There was no reason that they would have had to split it for this spectrum. And then you asked about the... Didn't we hear that they were requested by staff, ITU staff, to submit that way? They say that they were requested by ITU staff to submit that way for the KA band, for this different spectrum. That's where the issue was. The ITU staff didn't tell them anything about this band. That's what they chose to do. And then as far as the disclosure after the fact, of the submission is concerned, Mr. Carr said transparently, the real answer given in the order was this is an important protection from interference for this. But for something to be a protection, you have to be able to do something about it. It cannot be a protection when you can only hang it on your walls or archive it away, which is what seems to have happened here, because our March 6th subsequent showing has fallen on deaf ears and has had no effect whatsoever. Thank you.
judges: Rao, Childs, Ginsburg